## *In re* KING.

*(Circuit Court, W. D. Tennessee.  August 1, 1891.)*

1. CONSTITUTIONAL LAW—FOURTEENTH AMENDMENT—SUNDAY LAWS—RELIGIOUS LIBERTY.

    The fourteenth amendment of the constitution of the United States has not abrogated the Sunday laws of the states, and established religious freedom therein. The states may establish a church or creed, and maintain them, so far as the federal constitution is concerned.

2. SAME—DUE PROCESS OF LAW.

    When a state court of competent jurisdiction in due form has convicted the defendant of a crime, the verdict and judgment are conclusive evidence of the fact that it is, according to the law of the state, a crime to do the thing that was done, when the question is whether or not it be a crime at common law; and it is due process of law, under the fourteenth amendment of the federal constitution, if the state court deprive the defendant of his liberty by imprisonment under a lawful sentence upon such a conviction.

3. SAME—WORKING ON SUNDAY A NUISANCE—SEVENTH-DAY ADVENTISTS.

    Whatever opinion the federal court in Tennessee may have upon the question whether or not it be, at common law, an indictable nuisance in that state to work on Sunday, whenever the defendant has been convicted by the state court upon such an indictment, in due form of law, he cannot be discharged upon *habeas corpus* by the federal court, because the conviction itself is, for that case, the final and conclusive evidence of the law of the state, necessarily so; the common law itself; and therefore there has been due process of law in procuring the conviction of a Seventh-Day Adventist who had conscientiously worked on Sunday from his belief that Saturday was the Sabbath of the Christians, and not Sunday; and this, although the federal court was of a contrary opinion as to the nuisance.

4. SAME—HABEAS CORPUS—FEDERAL COURT INQUIRY—EVIDENCE—PROOF OF THE COMMON LAW.

    The federal court, upon *habeas corpus* by a defendant convicted of crime in a state court, proceeds to inquire independently whether the constitutional guaranty of the fourteenth amendment has been violated, but in making the inquiry must take the fact of conviction as evidence of the existence of an unwritten common law that the thing done was a crime. The federal court cannot review and correct any error of law or fact upon such a proceeding, and can only discharge the prisoner when it is shown that some fundamental principle has been violated, and not a merely erroneous conviction secured. The guilty or the innocent would be alike discharged upon the inquiry of the federal court, and under the same circumstances, always. The guilt or innocence of the defendant is not a legitimate inquiry in the federal court.

On *Habeas Corpus.*

The petitioner, R. M. King, a citizen of Obion county, Tenn., was indicted in the circuit court of that county for creating a common nuisance by working on Sunday.  He plowed in his fields on that day, he being a farmer, and that his daily vocation.  Being arrested and taken before a justice of the peace, he was fined three dollars, repeatedly, under section 2289, Code Tenn., (Mill. & V. Ed.,) which is the only legislation in Tennessee forbidding work on Sunday of this particular kind. These fines he paid, but continued to plow on Sunday as before.  His neighbors had him indicted as a common nuisance, for a crime at common law, with the purpose of having him more severely punished for the misdemeanor than the penalty under the statute.  He proved that he belonged to the religious sect of Seventh-Day Adventists, which denies that there has been any divine sanction of the change from the seventh to the first day of the week, and that he conscientiously and very strictly observed always the seventh day, as required by the fourth

commandment; that he was a poor man, and could not well give up two days in the week from work; that he did not work near any place of worship, or disturb any one engaged in worship by his work, which was done in a secluded place; and he set up his right to religious freedom of thought as a defense, and relied upon the statute as exclusive of all other offense or punishment; and denied, under his plea of not guilty, that it was an offense at common law to plow in one's fields on Sunday. The court having charged the jury that in Tennessee it is a nuisance at common law to work in one's fields on Sunday, and that the defendant's being a Seventh-Day Adventist did not exempt him, he was convicted by the jury, which fixed his fine at $75, and was committed to jail upon the sentence of the court until the fine and costs were paid. He appealed to the supreme court, taking, among others, exceptions to a very bitter and denunciatory speech of the prosecuting attorney severely arraigning him and his sect for its wickedness and immorality, comparing them to the Mormons, etc. The conviction was affirmed, but without any written opinion by the court, and the petitoner again sentenced to jail until the fine and costs were paid. Thereupon he filed this petition for *habeas corpus*, alleging that he had been deprived of his liberty without due process of law, denied the equal protection of the law, contrary to the fourteenth amendment of the constitution of the United States, and denied the religious freedom guarantied to him by the federal constitution. The sheriff of Obion county answered with the record of the proceedings in the state court, and denied the illegality of the imprisonment. The proof was taken before the circuit court of the United States, and substantially the same facts proved as those set out in the bill of exceptions in the state court. The petitioner moved for his discharge upon the return of the sheriff, upon the same grounds as those mentioned in the petition for *habeas corpus*.

*Thos. E. Richardson* and *Don M. Dickinson,* for petitioner.

*Smith & Collier,* for respondent.

HAMMOND, J. The petitioner, R. M. King, was in due form indicted in the circuit court for Obion county, for that "he then and there unlawfully and unnecessarily engaged in his secular business and performed his common avocation of life, to-wit, plowing on Sunday," which said working was charged to be "a common nuisance." Upon a formal trial by a jury, he was convicted and fined $75, which conviction was, upon appeal, affirmed by the supreme court, and, the fine not being paid, he was imprisoned, all in due form of law. He thereupon sued this writ of *habeas corpus,* alleging that he is held in custody in violation of the constitution of the United States, and the sheriff of Obion county sets up in defense of the writ the legal proceedings under which he has custody of the prisoner. The petitioner moves for his discharge upon the ground that he is held in violation of the fourteenth amendment of the constitution. He proves that he is a Seventh-Day Adventist, keeps Saturday according to his creed, and works on Sunday for that reason alone. The contention is "that there is not any law in Tennessee"

to justify the conviction which was had, and that the proceedings must be not only in legal form, but likewise grounded upon a law of the state, statute or common, making the conduct complained of by the indictment an offense; otherwise the imprisonment is arbitrary, and "without due process of law," just as effectually within the purview of the fourteenth amendment as if the method of procedure had been illegal and void. If there be no law in Tennessee, statute or common, making the act of working on Sunday a nuisance, then, indeed, the conviction is void, for the amendment is not merely a restraint upon arbitrary procedure in its form, but also in its substance, and, however strictly legal and orderly the court may have proceeded to conviction, if the act done was not a crime, as charged, there has been no "due process of law" to deprive the person of his liberty. This is, undoubtedly, the result of the adjudicated cases, and it is not necessary to cite them.

It is also true that congress has furnished the aggrieved person with a remedy by writ of *habeas corpus* to enforce in the federal courts the restrictions of this amendment, and protect him against arbitrary imprisonment, in the sense just mentioned; but it has not and could not constitute those courts tribunals of review to reverse and set aside the convictions in the state courts that may be illegal in the sense that they are founded on an erroneous judgment as to what the statute or common law of the state may be. If so, every conviction in the state courts would be reversible in the federal courts where errors of law could be assigned. To say that there is an absence of any law to justify the prosecution is only to say that the court has erred in declaring the law to be that the thing done is criminal under the law, and all errors of law import an absence of law to justify the judgment. I do not think the amendment or the *habeas corpus* act has conferred upon this court the power to overhaul the decisions of the state courts of Tennessee, and determine whether they have, in a given case, rightly adjudged the law of the state to have affixed a criminal quality to the given act of the petitioner.

It is urged that, if the judgment of conviction by the state court be held conclusive of the law in the given case, the amendment and the act of congress are emasculated, and there can be no inquiry in any case, of value to him who is imprisoned, as to whether he is deprived of his liberty without due process of law; that the federal court must, necessarily, make an independent inquiry to see whether there be any law, statute or common, upon which to found the conviction; or else the prisoner is remediless under federal law to redress a violation of this guaranty of the federal constitution. It is said that we make the same inquiry into the law of the state under the fourteenth amendment that we do into the law of the United States under the fifth amendment, containing precisely the same guaranty against the arbitrary exercise of federal power, and that the one is as plenary as the other; that this case does not fall within the category of those wherein, by act of congress, the federal courts must give effect to local law as declared by the state tribunals; and that, while

we may not review errors of judgment, we must, in execution of this amendment, vacate, by discharge on *habeas corpus*, any void judgment or sentence,—made void by the amendment itself.

The court concedes fully the soundness of this position, but not the application of it. It is quite difficult to draw the line of demarkation here between a line of judgment that shall protect the integrity of the state courts against impertinent review, and one that shall maintain the full measure of federal power in giving effect to the amendment; but, as has been said in other cases of like perplexity, we must confine our efforts to define the power and its limitations within the boundaries required for the careful adjudication of actual cases as they arise; and I think it more important still that we shall not overlook the fact that we have a dual and complex system of government, which fact of itself and by its necessary implications must modify the judgment on such questions as this, by conforming it to that fact itself; and we find here in this case an easy path out of this perplexity by doing this. Let us imagine a state without any common law, and only a statutory code of criminal law, and we have an example at hand in our federal state, where we are accustomed to say that the United States has no common law of crimes, and that he who accuses one of any offense must put his finger on some act of congress denouncing that particular conduct as criminal. If we were making the very inquiry so much argued in this case, whether it can be punishable as a crime to work in one's field on Sunday, within the domain of federal jurisprudence, say under the fifth amendment, instead of the fourteenth amendment, it would be easily resolved, and the prisoner would be discharged, unless the respondent could point to a statute making it so, and precisely according to the accusation or indictment. If such a simple condition of law existed in the state of Tennessee, we could have no trouble with this case. But it does not. There we have a vast body of unwritten laws, civil and criminal, as to which an entirely different method of ascertaining what is and what is not the law obtains. What is that method? It is not essential to go into any legal casuistry to determine whether, when a point of common law first arises for adjudication, the judges who declare it make the law, or only testify to the usage or custom which we call law, for it is equally binding in either case as a declaration. 1 Bl. Comm. 69. The judges are the depositaries of that law, just as the statute book is the depository of the statute law, and when they speak the law is established, and none can gainsay it. They have the power, for grave reasons, to change an adjudication, and re-establish the point, even reversely, but generally are bound and do adhere to the first precedent. This is "due process of law" in that matter. Moreover, when the mooted point has been finally adjudicated between the parties, it is absolutely conclusive as between them. Other parties, in other cases, may have the decision reversed as a precedent for all subsequent cases; but there is no remedy in that case or for that party, unless it may be by executive clemency, if a criminal case, against the erroneous declaration of the law. In that celebrated "disquisition," as he calls

it in the preface, of Mr. Jefferson, in which he so angrily combats the dictum of Sir MATTHEW HALE, that "Christianity is parcel of the laws of England," he accurately expresses this principle in these words: "But in later times we take no judge's word for what the law is, further than is warranted by the authorities he appeals to. His decision may bind the unfortunate individual who happens to be the particular subject of it, but it cannot alter the law." Jeff. Rep. (Va.) Append. 139. And Mr. Chief Justice CLAYTON, in his equally celebrated reply to Mr. Jefferson, states that this was the very point decided by the case cited from the Year Books (34 Hen. VI. 38) by Mr. Jefferson, and misunderstood by him; namely, that when the ecclesiastical court, in a case within its jurisdiction, had decided a given matter, the common law of England recognized it as conclusive, when collaterally called in question in the common-law courts. *State* v. *Chandler*, 2 Har. (Del.) 553, 559.

But the application of this principle should not be misunderstood here, and it should be remembered that in a case like this we apply it as a matter of evidence. The verdict of the jury, and the judgment of the state circuit court thereon, and its affirmance by the supreme court of Tennessee, (a mere incident this affirmance is, however, in the sense we are now considering the principle,) is to us here, and to all elsewhere, necessarily conclusive testimony as to what the common law of Tennessee is in the matter of King's plowing in his fields on the Sundays mentioned in the indictment, and proved in the record. As to the petitioner, whether he be an unfortunate victim of an erroneous verdict and decision or not, it is due process of law, and according to the law of the land, that he shall be bound by it everywhere, except in a court competent to review and reverse the verdict, and the judgment upon it; and, surely, it was not the intention of the fourteenth amendment to confer upon this court, or any other federal court of any degree whatever, *that* power. It was due process of law for the jury, having him properly in hand, to render the verdict, and for the court to pass judgment upon it; and the declaration of the judges that to do that which he did was a common nuisance, according to the common law of Tennessee, is conclusive evidence, as to *that* act of his, that it was so. This is not holding that the federal courts shall *not*, upon a *habeas corpus*, inquire independently as to whether the act complained of was a crime as charged in the indictment or not, but only that in making that inquiry, however independently, the verdict and judgment, if the state court had jurisdiction and the procedure has been regular, must be conclusive evidence on the point of law. It is not binding like the decisions which are rules of property are binding, because our federal statute says they shall be, nor like a matter of local law which the federal courts administer, because it is local law and binding between the parties,—these are inherently binding on us,—but binding as we are bound by the unimpeachable testimony of a witness, as we are bound by the conclusive evidence of a certificate of the secretary of state that certain given words constitute a statute of the state, or by the printed and authorized book of statutes, or by that judicial notice which we take that certain given words do constitute a statute, or as we might, under

some circumstances, be bound by the oral testimony of witnesses as to what is the law of a foreign state. In the very nature of the common law, and, indeed, as that very "due process of law" after which we are looking so concernedly in this case, this principle is fundamental. We have no other possible method of ascertaining what is the common law of Tennessee in this case than that of looking to the verdict and judgment as our witness of it. If we go to former precedents and other authorities, like those of the opinions of the sages and text-writers, we do that which no other court has power to do, in that case, except the court which had pending before it the indictment and the plea of the defendant thereto, making the technical issue as to what the law of the case was, and we usurp the functions of the trial judge and jury, or of the appellate court having authority to review the trial judge and jury. The guilt or innocence of the petitioner cannot be in the federal court a legitimate inquiry; either the guilty or the innocent would be alike discharged, on the *habeas corpus*, under the same circumstances, always; and neither can be discharged when the procedure is lawful and regular, however just or unjust the conviction might be. In the state court the question is—"Guilty or Not Guilty," in its widest scope. In the federal court there is a narrower and far less comprehensive inquiry, not like the other including both these questions and all that it is possible to bring within any adjudication, but only this—Is the proceeding lawful and regular in its relation to those essential and indispensable principles which are necessary to secure "life, liberty, or property?"

It is my opinion that this principle of establishing the common law by the authoritative judgment of its judges reaches even further than this, and that, evidentially, we are quite as conclusively bound, upon this independent inquiry we are making, by the testimony of the decision of *Parker* v. *State*, 16 Lea, 476, 1 S. W. Rep. 202, that it is a common nuisance in Tennessee, according to its common law, to work on Sunday; notwithstanding it somewhat ignominiously overrules, without mentioning it, the former precedents in that court of *State* v. *Lorry*, 7 Baxt. 95; because it is likewise a part of the principle itself that the last precedent is controlling; and we do not, as sugggested by counsel, take this conflict of precedent as authorizing an independent judgment, as we do in an entirely different class of cases involving the construction of contracts made by the state in the form of statutes. In that class of cases it is a mere conflict of opinion as to the intention of the parties in using certain words in their form of contract, generally as much open to the federal as the state courts, where the conflict has resulted in diverse opinions; but here there is not any such latitude of action because of the conclusive effect of a precedent at common law as evidence of the common law itself. This is what the supreme court means when it says, in cases like this and other cases there by writ of error from the state courts, that we are bound by the decisions of the state courts as to the criminal laws of the state. Whether it be a question as to whether there be a common-law crime or an offense under the proper construction of a doubtful statute, or whether the constitution of the state has been properly construed, it

is all the same. *In re Duncan*, 139 U. S. 449, 11 Sup. Ct. Rep. 573; *Leeper* v. *Texas*, 139 U. S. 462, 467, 11 Sup. Ct. Rep. 577; *In re Converse*, 137 U. S. 624, 11 Sup. Ct. Rep. 191; *Baldwin* v. *State*, 129 U. S. 52, 9 Sup. Ct. Rep. 193; and numerous other cases of like import might be cited. The result of them all is that in enforcing the fourteenth amendment the federal courts will confine themselves to the function of seeing that the fundamental principle that the citizen shall not be arbitrarily proceeded against contrary to the usual course of the law in such cases, nor punished without authority of law, nor unequally, and the like, shall not be violated in any given case; but they will not substitute their judgment for that of the state courts as to what are the laws of the state in any case. A proper adjustment of the two parts of our dual system of government requires this, and the utmost care should be taken not to impair the rightful operations of the state government, although they may, in a given case, appear to have wrought injustice or oppression. No government is free from such misfortunes occasionally arising, nor should they ever provoke the greater misfortune of the usurpation of unauthorized power by either of the branches of our system, state or federal. This view of the case disposes of it, for when the petitioner was, by lawful process, arraigned upon indictment, and by lawful trial convicted of a crime in a court having the lawful right to declare his conduct to have been a crime, he has had "due process of law," and has been made to suffer "according to the law of the land," albeit the court may have made a mistake of fact or law in the progress of that particular administration of the "law of the land." That mistake we cannot correct, nor can any court after final judgment; and this itself is one of the fundamental principles, essential to be preserved as one of the elements of that "due process of law," secured by the fourteenth amendment.

Perhaps this judgment should end here, and that, technically, nothing more should be said. Yet it may be due to counsel to give some response to their extended and really very able arguments upon other questions which they think are involved, and which they wish to have decided in this case. As we do not refuse their motion to discharge the petitioner because of any want of jurisdiction, but only because we decide that he has not been convicted without due process of law, as he alleges, it may not be improper, and, at least, it will emphasize our judicial allegiance to the principle already adverted to of the conclusiveness, as a matter of evidence, of the verdict against him, if we say that but for that allegiance we should have no difficulty in thinking that King has been wrongfully convicted. Not because he has any guaranty under the federal or state constitutions against a law denouncing him and punishing him for a nuisance in working on Sunday, for he has not. It was a belief of Mr. Madison and other founders of our government that they had practically established absolute religious freedom and exemption from persecution for opinion's sake in matters of religion; but while they made immense strides in that direction, and subsequent progress in freedom of thought has advanced the liberalism of the conception these

founders had, as a matter of fact they left to the states the most absolute power on the subject, and any of them might, if they chose, establish a creed and a church and maintain them.    The most they did, as they confessed, was to set a good example by the federal constitution, and happily that example has been substantially followed in this matter, and by no state more thoroughly than Tennessee, where sectarian freedom of re-ligious belief is guarantied by the constitution; not in a sense argued here, that King, as a Seventh-Day Adventist, or some other as a Jew, or yet another as a Seventh-Day Baptist, might set at defiance the prejudices, if you please, of other sects having control of legislation in the matter of Sunday observances, but only in the sense that he should not himself be disturbed in the practices of his creed, which is quite a different thing from saying that in the course of his daily labor, disconnected with his religion, just as much as other people's labor is disconnected with their religion, labor not being an acknowledged principle or tenet of religion by him, nor generally or anywhere, he might disregard laws made in aid, if you choose to say so, of the religion of other sects.    We say not acknowledged by him, because, although he testifies that the fourth commandment is as binding in its direction for labor on six days of the week as for rest on the seventh, he does not prove that that notion is held · as a part of the creed of his sect and religiously observed as such, and we know, historically, that generally it has not been so considered by any religionists or their teachers.    But if a non-conformist of any kind should enter the church of another sect, and those assembled there were required, every one of them, to comply with a certain ceremony, he could not discourteously refuse because his mode was different, or because he did not believe in the divine sanction of that ceremony, and rely upon this constitutional guaranty to protect his refusal.    We do not say Sunday observance may be compelled upon this principle, as a religious act, but only illustrate that the constitutional guaranty of religious freedom does not afford the measure of duty under such circumstances, nor does it any more, it seems to us, protect the citizen in refusing to conform to Sunday ordinances.    It was not intended to have that effect any more than under our federal constitution the polygamists may defy the Christian laws against bigamy upon the ground of religious feeling or sentiment, the freedom of which has been guarantied.    Nor do we believe King was wrongfully convicted, because Christianity is not a part of the law of the land; for, in the sense pointed out by Mr. Chief Justice CLAYTON in State v. Chandler, supra, and more recently by Dr. Anderson, a clergyman before the Social Science Association, (20 Alb. Law J., 265, 285,) it surely is; but not in the dangerous sense so forcibly combated by Mr. Jefferson and other writers following him in the controversy over it.    The fourth commandment is neither a part of the common law or the statute, and disobedience to it is not punishable by law; and certainly the substitution of the first day of the week for the seventh as a part of the commandment has not been accomplished by municipal process, and the substitution is not binding as such.    The danger that lurks in this application of the aphorism has been noted by every intelligent writer under

my observation, and all agree that this commandment, either in its original form, as practiced by petitioner, or in its substituted application to the first day of the week, is not more a part of our common law than the doctrine of the Trinity or the Apostles' creed. Nevertheless, by a sort of factitious advantage, the observers of Sunday have secured the aid of the civil law, and adhere to that advantage with great tenacity, in spite of the clamor for religious freedom and the progress that has been made in the absolute separation of church and state, and in spite of the strong and merciless attack that has always been ready, in the field of controversial theology, to be made, as it has been made here, upon the claim for divine authority for the change from the seventh to the first day of the week. Volumes have been written upon that subject, and it is not useful to attempt to add anything to it here. We have no tribunals for its decision, and the efforts to extirpate the advantage above mentioned by judicial decision in favor of a civil right to disregard the change seem to me quite useless. The proper appeal is to the legislature. For the courts cannot change that which ·has been done, however done, by the civil law in favor of the Sunday observers. The religion of Jesus Christ is so interwoven with the texture of our civilization, and every one of its institutions, that it is impossible for any man, or set of men, to live among us, and find exemption from its influences and restraints. Sunday observance is so essentially a part of that religion that it is impossible to rid our laws of it, quite as impossible as to abolish the custom we have of using the English language, or clothing ourselves with the garments appropriate to our sex. The logic of personal liberty would allow, perhaps demand, a choice of garments, but the choice is denied. So civil or religious freedom may stop short of its logic in this matter of Sunday observance. It is idle to expect in government perfect action or harmony of essential principles, and whoever administers, whoever makes, and whoever executes the laws must take into account the imperfections, the passions, the prejudices, religious or other, and the errings of men because of these. We cannot have in individual cases a perfect observance of Sunday, according to the rules of religion; and, indeed, the sects are at war with each other as to the modes of observance. And yet no wise man will say that there shall be therefore no observance at all. Government leaves the warring sects to observe as they will, so they do not disturb each other; and as to the non-observer, he cannot be allowed his fullest personal freedom in all respects. Largely, he is allowed to do as he pleases, and generally there is no pursuit of him, in these days, as a mere matter of disciplining his conscience; but only when he defiantly sets up his non-observance by ostentatious display of his disrespect for the feelings or prejudices of others.

If the human impulse to rest on as many days as one can have for rest from toil is not adequate, as it usually is, to secure abstention from daily vocations on Sunday, one may, and many thousands do, work on that day, without complaint from any source; but if one ostentatiously labors for the purpose of emphasizing his distaste for or his disbelief in the custom, he may be made to suffer for his defiance by persecutions, if you

call them so, on the part of the great majority, who will compel him to rest when they rest, as it does in many other instances compel men to yield individual tastes to the public taste, sometimes by positive law, and sometimes by a universal public opinion and practice far more potential than a formal statute. There is scarcely any man who has not had to yield something to this law of the majority, which is itself a universal law, from which we cannot escape in the name of equal rights or civil liberty. As before remarked, one may not discard his garments, and appear without them, or in those not belonging to the sex, and this illustration is used rather than others frequently given, based on the laws of sanitation, education, immoral practices, cruelty, blasphemy, and the like, because it seems somewhat freer from the inherent element of injury to others, and contains likewise the element of a selection that would seem to be harmless in itself; so that it illustrates, pertinently, that one must observe the general custom as to a day of public rest, just as he must reasonably wear the garments of his sex selected by general custom. Therefore, while out of our 64,000,000 of people there are a comparatively very few thousands who prefer the seventh day to the first as a day of rest and for religious observances, according to the strict letter of the commandment, and who, possibly with good reason, resent the change that has been made as being without divine sanction, the fact remains that the change has been made by almost universal custom, and they must conform to it so far as it relates to its quality as a day of public rest.

And here it may be noted that sometimes too little heed is given in the consideration of the question to this quality of associated rest from labor. It is not altogether an individual matter of benefit from the rest, for undoubtedly to each individual one day of the seven would answer as well as another, but it is the benefit to the population of a general and aggregate cessation from labor on a given day, which the law would secure, because for good reason, no doubt, found in our practice of it, it is beneficial to the population to do this thing, and they have established the custom to do it. The fact that religious belief is one of the foundations of the custom is no objection to it, as long as the individual is not compelled to observe the religious ceremonies others choose to observe in connection with their rest days. As we said in the outset, not one of our laws or institutions or customs is free from the influence of our religion, and that religion has put our race and people in the very front of all nations in everything that makes the human race comfortable and useful in the world. This very principle of religious freedom is the product of our religion, as all of our good customs are, and if it be desirable to extend that principle to the ultimate condition that no man shall be in the least restrained, by law or public opinion, in hostility to religion itself, or in the exhibition of individual eccentricities or practices of sectarian peculiarities of religious observances of any kind, or be fretted with laws colored by any religion that is distasteful to anybody, those who desire that condition must, necessarily, await its growth into that enlarged application. But the courts cannot, in cases like this, ig-

nore the existing customs and laws of the masses, nor their prejudices and passions even, to lift the individual out of the restraints surrounding him because of those customs and laws, before the time has come when public opinion shall free all men in the manner desired. Therefore it is that the petitioner cannot shelter himself just yet behind the doctrine of religious freedom in defying the existence of a law, and its application to him, which is distasteful to his own religious feeling or fanaticism, that the seventh day of the week, instead of the first, should be set apart by the public for the day of public rest and religious practices. That is what he really believes and wishes, he and his sect, and not that each individual shall select his own day of public rest and his own day of labor. His real complaint is that his adversaries on this point have the advantage of usage and custom, and the laws founded on that usage and custom, not that religious freedom has been denied to him. He does not belong to the class that would abrogate all laws for a day of rest because the day of rest is useful to religion, and aids in maintaining its churches, for none more than he professes the sanctifying influence of the fourth commandment, the literal observance of which by himself and all men is the distinguishing demand of his own peculiar sect. His demand for religious freedom is as disingenuous here as is the argument of his adversary sects that it is the economic value of the day of rest, and not its religious character, which they would preserve by civil law. The truth is, both are dominated by their religious controversy over the day, but, like all other motives that are immaterial in the administration of the law, the courts are not concerned with them. Malice, religious or other, may dictate a prosecution, but if the law has been violated this fact never shields the law-breaker. Neither do the courts require that there shall be some moral obloquy to support a given law before enforcing it, and it is not necessary to maintain that to violate the Sunday observance custom shall be of itself immoral, to make it criminal in the eyes of the law. It may be harmless in itself, because, as petitioner believes, God has not set apart that day for rest and holiness, to work on Sunday, and yet if man has set it apart, in due form, by his law, for rest, it must be obeyed as man's law, if not as God's law; and it is just as evil to violate such a law, in the eyes of the world, as one sanctioned by God,—I mean just as criminal in law. The crime is in doing the thing forbidden by law, harmless though it be in itself. *U. S.* v. *Jackson,* 25 Fed. Rep. 548; *In re Coy,* 31 Fed. Rep. 794, 127 U. S. 731, 733, 8 Sup. Ct. Rep. 1263. Therefore all that part of the argument that it is not hurtful in itself to work on Sunday, apart from the religious sanctity of the day, is beside the question; for it may be that the courts would hold that repeated repetitions of a violation of law, forbidding even a harmless thing, could be a nuisance, as tending to a breach of the peace. 2 Bish. Crim. Law, § 965; 1 Bish. Crim. Law, § 812. Neglecting to do a thing is sometimes a nuisance. 1 Russ. Crimes, 318. That is to say, a nuisance might be predicated of an act harmless in itself, if the will of the majority had lawfully forbidden the act, and rebellion against that will would be the *gravamen* of the offense,—or, to

express it otherwise, there is in one sense a certain immorality in refusing obedience to the laws of one's country, subjection to which God himself has enjoined upon us.

But whatever plenary power may exist in the state to declare repeated violations of its laws and the usages of its people a nuisance and criminal, until the case of *Parker* v. *State, supra,* and until this case of King, to which we yield our judicial obedience, there seems not to have been any law, statute or common, declaring the violation of the statutes against working on Sunday a common nuisance. Mr. Chief Justice RUFFIN has demonstrated, we think, that there was no such common law of the mother state of North Carolina, from which we have derived our common law and these Sunday statutes. Mill. & V., Code, §§ 2009–2013, 2289; Act 1741 (N. C.;) 1 Scott, Rev. 55, 795; Car. & Nich. 638; *State* v. *Williams,* 4 Ired. 400; *State* v. *Brooksbank,* 6 Ired. 73. The case of *State* v. *Lorry,* 7 Baxt. 95, is in accordance with these authorities; and I may say that, with some patience, I have traced as far as I have been able the common-law authorities, and, if the judgment rested with me, should say that there is not any foundation in them for the ruling that it is a common-law nuisance to work in one's fields on Sunday; and the supreme court of North Carolina so decided. MAULE, J., said in *Rawlins* v. *West Derby,* 2 C. B. 74, that "in the time of Charles II. an act of parliament passed providing that certain things that formerly might have been done on Sunday should no longer be done on that day, all other things being left to the freedom of the common law." This act was not adopted by North Carolina or by Tennessee as part of their common law, but was by North Carolina, and afterwards by Tennessee, substantially re-enacted, and is the foundation of our Sunday laws. The precedent for a common-law indictment taken by Chitty from a manual known as the "Circuit Companion" was omitted from subsequent editions. 2 Chit. Crim. Law, (6th Ed.) 20, and note. And while many American courts have laid hold of the statements in the old text-writers that such an indictment was known at common law, and upon their authority subsequent writers have proceeded to state the text-law to be so, it is quite certain that no adjudicated case in England can be found to establish the statement that, strictly and technically, there was any such offense known to the common law. In this sense it may be said that King was wrongfully convicted, the *State* v. *Lorry* wrongfully overruled, and *Parker* v. *State* wrongfully decided; but it does not belong to this court to overrule these decisions, and it does belong to the state court to make them, and King's conviction under them is "due process of law." Remand the prisoner.